**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 25-CR-00246 (TSC)** |
| **AMARION LANGSTON,** | |
| **Defendant.** | |

## EMERGENCY MOTION TO STAY DEFENDANT'S RELEASE AND *DE NOVO* REVIEW OF MAGISTRATE'S RELEASE ORDER

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, seeks this Court's review of the release order by the Honorable Magistrate Judge G. Michael Harvey issued on August 28, 2025. The Government first requests that the Court stay Magistrate Judge Harvey's order releasing the defendant. The Government further requests that the Court grant a *de novo* review of Magistrate Judge Harvey's denial of the Government's motion for pre-trial detention, pursuant to 18 U.S.C. § 3142(f)(1)(E) (Felony Involving Possession or Use of a Firearm) and 18 U.S.C. § 3142(d)(1)(A)(iii) (On Probation or Parole). This Court has the authority to grant a stay to consider this emergency *de novo* review of the Magistrate Judge's order of release.

Amarion Langston ("the Defendant") has prior convictions for Attempted Kidnapping, Attempted Robbery, and Carrying a Pistol Without a License (CPWL) and committed the instant offense while on supervised release in D.C. Superior Court case number 2022 CF3 004345. The conditions of the Defendant's release in that case required that he not commit any further violations of Federal law and stay away from firearms. As set out further below, the Defendant flouted both of these conditions. Further, the Defendant was only arrested after he recklessly tried

1

to flee from law enforcement in his car with a minor child in the backseat, crashed that car and put the child in serious risk of injury or death, and then fleeing from the car without checking on the welfare of the child. Given these facts and other set forth below, the Defendant is a danger to the community. The Court should order the Defendant detained until trial.

## BACKGROUND

On August 16, 2025, at approximately 2:38 PM, members of the United States Park Police and United States Marshals Service were patrolling the 2300 Block of Savannah Street SE when they observed a black Nissan Rogue traveling more than the posted speed limit. The vehicle was also heavily tinted such that law enforcement could not determine the number of people inside the vehicle at the time. Law enforcement conducted a query of the tag, which revealed that the tag belonged to an Infiniti vehicle. As law enforcement attempted to initiate a traffic stop by activating their lights and sirens, the vehicle accelerated rapidly, nearly striking another vehicle and then driving up onto the curb to flee. Law enforcement pursued the vehicle and broadcasted its location.

Near the 1800 Block of 27th Street SE, the operator lost control of the vehicle, causing it to strike a tree on the left, side of the roadway before sliding back to the right side of the roadway and colliding with a guardrail. The driver, later identified as the Defendant, Amarion Langston, got out of the vehicle and attempted to flee on foot into the woods. No other people that were inside the vehicle exited the vehicle at the time. Law enforcement pursued the Defendant on foot and issued verbal commands to stop, but the Defendant continued to run. Shortly thereafter, law enforcement was able to catch up to the Defendant and detain him. Law enforcement then identified the other occupants of the vehicle: Tyrese Thomas, the front-passenger seat and a young child, Witness 1, in the back seat. Below is a photograph of the resting location of the crashed vehicle and the level that the windows had been down at the time. *See* Figure 1, below.



**Figure 1: Crashed Car**

Law enforcement canvassed the area around the crash and located a Glock magazine, with a 10-round capacity, in the roadway near the initial crash site with the tree.  Notably, the magazine baseplate and magazine spring were dislodged, and ammunition was laying on the ground  next  to the magazine. In all, law enforcement located eight rounds of .45 caliber ammunition. Even though the magazine was in the roadway near the crashed vehicle, the magazine did not have any damage indicating that it had been run over or crushed by a vehicle.  Below is a photograph of the magazine and ammunition in the roadway. *See* Figure 2, below.



**Figure 2: Ammunition**

Law enforcement then located a black .45 caliber Glock 21 handgun bearing serial number CBYC221 on the side of the roadway near the location at which the vehicle had struck the tree. The handgun was loaded with one round in the chamber; it did not contain a magazine. Law enforcement observed what appeared to be a fresh imprint in the ground in which the handgun was laying and fresh mud on its barrel. The handgun did not appear to be weathered or rusted, indicating that it had not been exposed to the elements for a significant period. Below are two photographs of where the handgun was recovered, followed by a photograph of the handgun after it had been recovered. *See* Figures 3 and 4, below.



**Figure 3: Location of Firearm**



**Figure 4: Discarded Firearm**



**Figure 5: Discarded Firearm with Loaded Round**



**Figure 6: Magazine with 8 Rounds**

Law enforcement confirmed that the recovered magazine, pictured above, was compatible with the firearm and ammunition.

After the Defendant was detained and placed in handcuffs, law enforcement interviewed Tyrese Thomas.[1] She stated to officers that she just bought the car, and it was an old license plate. She stated the Defendant acknowledged that the police were in front of them. She stated that her and the minor child were telling the Defendant to stop the vehicle while he was driving.

Tyrese Thomas initially stated that she had no knowledge that the Defendant had a firearm in the vehicle, but she later admitted that the Glock handgun belonged to her, though she was not carrying it. She stated that she did not know why the Defendant ran from the vehicle after the crash and claimed that she did not see a firearm in the car. Ms. Thomas further claimed that she had never seen the Defendant with a gun, and that the Defendant did not carry or possess guns. Upon further investigation, the firearm was previously registered to Ms. Thomas but her registration and license to carry a pistol in the District of Columbia were revoked in September 2024. Finally, Ms. Thomas stated that she did not know her license and had registration expired. Law enforcement confirmed that the Defendant had neither a driver's license nor a license to carry a pistol in the District of Columbia.[2]

The Defendant was initially charged with, among other things, Unlawful Possession of a Firearm, Aggravated Reckless Driving, Second Degree Cruelty to Children Grave Risk, and Fleeing from a Law Enforcement Officer in a Motor Vehicle.

---

[1] Tyrese Thomas was charged with Carrying a Pistol without a License in this case, Superior Court case no. 2025 CF2 9867. Her preliminary hearing was held on August 20, 2025, and probable cause was found, but she was released with conditions.

[2] After arrest, Defendant stated to officers that had run because he was scared and denied having a firearm. While being transported after arrest, Defendant stated that the firearm was registered.

## PROCEDURAL HISTORY

On August 18, 2025, Magistrate Judge Moxila A. Upadhyaya signed a federal criminal complaint against the Defendant for the conduct described above, including a violation of 18 U.S.C. § 922(g)(1) (unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year). The Defendant's initial appearance was on August 19, 2025, before Magistrate Judge Matthew J. Sharbaugh. The United States requested pretrial detention. The Court ordered Defendant held without bond pending a detention hearing set for August 22, 2025.

On August 26, 2025, a grand jury for the United States Court for the District of Columbia returned a one-count indictment against the Defendant for violating 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year).

On August 26 and 28, 2025, the parties appeared for a detention hearing in front of Magistrate Judge Harvey. After considering the Government's written submission and oral arguments by both parties, Judge Harvey denied the Government's motion for pretrial detention and ordered the Defendant released.

This Emergency Motion to Stay Defendant's Release and *De Novo* Review of the Magistrate's Release Order now follows. There is a status hearing scheduled for September 8, 2025 before this Court.

## ARGUMENT

### I. This Court Has the Authority to Grant the Motion to Stay Release Pending Appeal

The power to stay an order of release is directly related to a district court's authority to review a release order of a magistrate judge. *See, e.g.*, *United States v. Brigham*, 569 F.3d 220,

230 (5th Cir. 2009) ("given that the issue being reviewed involves a person's release from custody pending further legal proceedings, the absence of stay authority could render the district court's review power illusory."). An alternative interpretation would risk allowing the charged defendant the opportunity to "harm[] the community or disappear[] by the time the district court's ruling is rendered and detention is ordered" if the district court determines to order the defendant detained. *Id.*; *see also United States v. Salazar-Andujo*, 599 F. Supp. 3d 491, 494 (W.D. Tex. 2022); *United States v. Rosales-Villegas*, No.: 2:23-cr-00044-GMN-VCF, 2023 U.S. Dist. LEXIS 59776, at *5- 6, 7 n.1 (D. Nev. Apr. 4, 2023) ("The Court's decision is also based on unanimous caselaw. As the Government notes, "stays of release are so commonplace and uncontroversial that they are often relegated to a sentence or two in the procedural history of an opinion on the merits of the detention decision." (Resp. 3:9-24) (collecting cases). Here, the Court is guided by the practical considerations underlying the issuance of a stay as well as caselaw within the Ninth Circuit routinely authorizing stays.")).

The government is aware of Magistrate Judge Zia M. Faruqui's recent decision denying a motion to stay in *United States v. Abass*, 25-CR-00079 (TSC), ECF No. 12 (April 11, 2025). Judge Faruqui indicated that although magistrate courts typically suspend an order of release pending the government's request for *de novo* review of the Magistrate Judge's release order, that the Court would no longer do so under the four factors articulated in *Nken v. Holder*, 556 U.S. 418 (2009). The government, however, is not seeking an extraordinary length of time in which to have the Court consider the merits of a stay which will require significant, detailed briefing, but rather, an emergency stay to present the merits of the requested detention to the district court judge.

Thus, the Government seeks a brief administrative stay of the order of release, and as such, the request should not be analyzed under the *Nken* factors. As this Circuit has noted, "[t]he purpose

of [this] administrative stay is to give the court sufficient opportunity to consider the merits of the motion for a stay pending appeal." *Cobell v. Norton*, No. 03-5262, 2004 WL 603456, at *1 (D.C. Cir. Mar. 24, 2004). Such a stay, as the Supreme Court noted recently in *United States v. Texas*, 144 S. Ct. 797, 798 (2024), "buys the court time to deliberate" and does not "typically reflect the court's consideration of the merits." *Id.* at 798 (Barret, J., concurring). District courts have recognized that administrative stays are also applicable in seeking emergency relief, including in the District of Columbia. *See, e.g.*, *Dellinger v. Bessent*, 2025 WL 450488 (D.D.C. Feb. 10, 2025); *National Council of Nonprofits v. Office of Management & Budget*, 2025 WL 314433 (D.D.C. Jan. 28, 2025); *Order, Texas v. Department of Homeland Security*, No. 24-CV-306 (E.D. Tex. Aug. 26, 2024). As these courts have recognized, the "[t]he authority for an administrative stay arises from the All Writs Act and a court's inherent authority to manage its docket." *Dellinger*, 2025 WL 450488 (quoting *Order, Texas,* No. 24-CV-306, at 2).

## II.    *De Novo* Review of the Magistrate's Release Order

As an initial matter, a defendant must be detained pending trial, if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(f)(1). The Government must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988). In contrast, "[a] determination that an individual is a flight risk must be supported by a preponderance of the evidence." *United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019).

Further, Title 18, U.S.C. § 3145(a) states:

  **(a) Review of a release order –** If a person is ordered released by a magistrate, …

      (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for

> revocation of the order or amendment of the conditions of release
> . . .

The motion shall be determined promptly.

On the Government's motion to review a release order, this Court considers *de novo* the magistrate judge's denial of pre-trial detention. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not previously raised.

In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.  As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . .

*See* S. Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196.[3]

---

[3] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to

There are four factors under Section 3142(g) that the Court should consider and weigh in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). In consideration of these factors, the government respectfully submits that there is no condition, or combination of conditions, that would assure the safety of the community or the defendant's appearance at future proceedings.

### A. Nature and Circumstances of the Offense Charged

The first factor to be considered is the nature and circumstances of the offense charged, which weighs in favor of detention. This offense began with the Defendant's refusal to comply with law enforcement. Specifically, the Defendant drove away when law enforcement tried to conduct a traffic stop of his vehicle, then ran away from officers on foot when they sought to arrest him.

When the police were finally able to bring the Defendant into custody, they located a firearm where the vehicle had struck the tree. The firearm was located on the opposite side of the road as Defendant's flight on foot. The firearm was loaded with one round in the chamber. In other words, it was primed and ready to use. The danger posed by this behavior—while already on

---

those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

*See* S. Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487. (Emphasis added.)

supervised release for multiple violent felonies and a firearm offense—is exactly why the Bail Reform Act contemplates pretrial detention for this charge. *See United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (J. McFadden) (finding that, in the context of determining the nature and circumstances of the offense, a felon "carrying a loaded firearm—especially if the carrier has a violent history, including a conviction for armed robbery—has the great potential to escalate into violence."). The Defendant's lack of concern for the safety of law enforcement officers, the public's safety, as well as the safety of the passengers in his own vehicle – including a minor child – is alarming and weighs in favor of detention.

### B. Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also weighs in favor of detention.[4]  Although the firearm, ammunition, and magazine were not discovered on the Defendant's person, and not located in the Defendant's foot path, they were located near the crash site where the Defendant's car crashed into a tree. Significantly, the firearm had been previously registered to the passenger, Tyrese Thomas. The firearm, magazine, and ammunition were found in the roadway. The magazine baseplate and spring were dislodged, and .45 caliber ammunition was laying on the ground next to the magazine. This caliber of ammunition matched the caliber of firearm recovered. Moreover, the magazine did not have any damage indicating that it had been

---

[4] This factor should be equally weighed. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, then Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." No. 23-CR-25, 2023 WL 1778194, at *8 (D.D.C. Feb. 6, 2023). Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). The Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

run over or crushed by a vehicle. This condition suggested that the magazine had been discarded recently.

Similarly, the firearm was located on the side of the roadway near the location at which the vehicle had struck the tree.  It was loaded with one round in the chamber but was missing a magazine. Law enforcement observed what appeared to be a fresh imprint in the ground where the firearm was laying and fresh mud on its barrel.  The firearm did not appear to be weathered or rusted, indicating that it had not been exposed to the elements for any significant period.

Additionally, the Defendant's flight in this case, first in his vehicle, then on foot, demonstrates his consciousness of guilt. Instead of stopping, the Defendant rapidly accelerated the vehicle, nearly striking a motorist, then driving over a curb and down a sidewalk. After crashing the vehicle, the Defendant then fled into the woods to evade law enforcement. The Defendant knew he was not permitted to possess a firearm, did not want to be caught with a firearm, and tried in vain to discard the illegal weapon before his capture.  This demonstrated consciousness of guilt is powerful evidence of the defendant's possession of the firearm and ammunition.

### C. History and Characteristics of the Defendant

The third factor, the Defendant's history and characteristics, weighs in favor of detention.[5] As noted above, the Defendant was previously convicted in District of Columbia Superior Court case number 2022-CF3-004345 for Attempted Robbery, Attempted Kidnapping, and Carrying a Pistol Without a License.

According to the Proffer of Facts in that case, Gov't Ex. 1, the Defendant admitted to the following in connection with his guilty plea:

---

[5] The Government has grave concern with Defendant's conduct on pages 4 and 5 of the PSA report. This conduct shows an ongoing dangerous pattern.

Defendant Andre Latimore arranged through Instagram messages to meet with victims D.G. and B.M., purportedly to purchase designer sunglasses from them. On the morning of July 28, 2022, Defendant Latimore met the victims in front of 4900 Alabama Avenue Southeast, Washington D.C. The victims handed Defendant Latimore a pair of purple Cartier sunglasses. As Co-Defendant Latimore was looking at the sunglasses, Defendant Tyrigue Humble and Defendant Amarion Langston came out of 4900 Alabama Avenue. At that point, all three defendants produced firearms. Defendant Latimore produced a pistol out of his waistband and place it to D.G.'s head. Defendant Humble produced a pistol and placed it at D.G.'s side. Defendant Langston pulled out a rifle and placed it on D.G.'s side. Seeing the firearms, B.M. proceeded to get inside his vehicle, flee the scene, and flag down a Metropolitan Police Department ("MPD") officer in the 3700 block of Minnesota Avenue Southeast.

Defendant Latimore advised D.G. to walk across the street and go behind 4903 Alabama Avenue Southeast. In the rear of 4903 Alabama Avenue, Defendants still had D.G. at gunpoint. Defendant Latimore and Defendant Humble proceeded to go through D.G.'s pockets and took his wallet. From that wallet, they took a Bank of America business card, a Wells Fargo debit card, a Coinbase debit card, and $280.

Defendant Latimore then produced a phone and began using it to record D.G. Defendant Latimore smacked D.G. with an open hand multiple times. Defendant Humble pistol-whipped D.G. Defendant Langston told D.G. he would shoot him. Defendant Latimore told D.G. "we are going to kidnap you for the day." The defendants then proceeded to walk D.G. across a courtyard into 4900 Alabama Ave Southeast, at which time they sat him down in a landing between some stairs. Defendant Humble told D.G. to send him $1000 with his phone. Defendant Humble then took D.G.'s phone and attempted to conduct three money transfer transactions, all of which were declined. Defendant Latimore and Defendant Langston switched guns, such that Defendant Langston was then carrying a pistol.

Meanwhile, MPD officers had responded to the address in response to the flag down report from B.M. The Defendants and D.G. saw officers begin walking towards 4900 Alabama Ave Southeast where they were located. Defendants ran inside an apartment and D.G. ran out of the building, as officers were entering. He advised officers that the suspects had run upstairs.

MPD declared a barricade situation and proceeded to secure the scene and set up a perimeter around 4900 Alabama Avenue Southeast. Each Defendant eventually came out of the building, was identified as one of the robbers by D.G., and was arrested.

On April 21, 2023, the Defendant was sentenced to a total of 36 months' incarceration followed by three years of supervised release. The Defendant  has been on supervision since April

10, 2025, and committed this offense while on supervised release, less than five months after being released from incarceration.

The Defendant's history demonstrates that he has had several chances to be a law-abiding citizen, and each time, chosen to break the law. The Defendant continually disregards the law and safety, ignores law enforcement commands, and now he has failed to comply with court ordered supervision. Consequently, this factor weighs in favor of detention.

### D. Danger to the Community

The fourth and final factor, the danger to any person or the community posed by the Defendant's release, similarly weighs in favor of detention. Despite knowing he was a convicted felon, the Defendant possessed a loaded firearm, with a round chambered. The state of readiness of that firearm demonstrates that the Defendant was ready, willing, and able to commit another crime against members of the community. *See United States v. Gassaway*, 1:21-cr-00550 (RCL), ECF No. 9 (D.D.C. Sept. 16, 2021) ("This Court agrees with other courts in this district that unlawfully carrying a concealed or loaded firearm in public poses a risk of danger to the public."); *see also United States v. Washington*, 907 F. Supp. 476, 486 (D.D.C. 1995) ("[P]ossession by a felon of a fully loaded semi-automatic pistol suggests that the defendant presents an extreme safety risk to the public."). Moreover, the Defendant's willingness to flee from law enforcement in ways dangerous to innocent bystanders, including driving recklessly with a minor child in the back seat of his vehicle and ultimately crashing the vehicle, demonstrates the danger he poses to the community and to his own loved ones. Therefore, this factor heavily weighs in favor of detention.

### CONCLUSION

Defendant Langston is eligible for pretrial detention. All four of the Bail Reform Act factors weigh in favor of pretrial detention, and the Defendant poses a risk of danger to the

community if he is released pending trial in this case. For these reasons, the Government requests that the Defendant be detained pending trial, respectfully requests a hearing as soon as practicable, and requests that Magistrate Harvey's release order be stayed pending that hearing and the defendant be detained.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: _____s/ *Jared English*_____
JARED ENGLISH
D.C. Bar No. 1023926
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
202-465-0089
Jared.English@usdoj.gov

# Gov't Ex. 1

## PROFFER OF FACTS

Had this case gone to trial, the Government's evidence would have proven beyond a reasonable doubt that Defendant Andre Latimore arranged through Instagram messages to meet with victims D.G. and B.M., purportedly to purchase designer sunglasses from them. On the morning of July 28, 2022, Defendant Latimore met the victims in front of 4900 Alabama Avenue Southeast, Washington D.C. The victims handed Defendant Latimore a pair of purple Cartier sunglasses. As Defendant Latimore was looking at the sunglasses, Defendants Tyrigue Humble and Amarion Langston came out of 4900 Alabama Avenue. At that point, all three defendants produced firearms. Defendant Latimore produced a pistol out of his waistband and place it to D.G.'s head. Defendant Humble produced a pistol and placed it at D.G.'s side. Defendant Langston pulled out a rifle and placed it on D.G.'s side. Seeing the firearms, B.M. proceeded to get inside his vehicle, flee the scene, and flag down a Metropolitan Police Department ("MPD") officer in the 3700 block of Minnesota Avenue Southeast.

Defendant Latimore advised D.G. to walk across the street and go behind 4903 Alabama Avenue Southeast. In the rear of 4903 Alabama Avenue, Defendants still had D.G. at gunpoint. Defendant Latimore and Defendant Humble proceeded to go through D.G.'s pockets and took his wallet. From that wallet, they took a Bank of America business card, a Wells Fargo debit card, a Coinbase debit card, and $280.

Defendant Latimore then produced a phone and began using it to record D.G. Defendant Latimore smacked D.G. with an open hand multiple times. Defendant Latimore told D.G. "we are going to kidnap you for the day." The defendants then proceeded to walk D.G. across a courtyard into 4900 Alabama Ave Southeast, at which time they sat him down in a landing between some stairs. Defendant Humble told D.G. to send him $1000 with his phone. Defendant Humble then took D.G.'s phone and attempted to conduct three money transfer transactions, all of which were declined. Defendant Latimore and Defendant Langston switched guns, such that Defendant Langston was then carrying a pistol.

Meanwhile, MPD officers had responded to the address in response to the flag down report from B.M. The Defendants and D.G. saw officers begin walking towards 4900 Alabama Ave Southeast where they were located. Defendants ran inside an apartment and D.G. ran out of the building, as officers were entering. He advised officers that the suspects had run upstairs.

MPD declared a barricade situation and proceeded to secure the scene and set up a perimeter around 4900 Alabama Avenue Southeast. Each Defendant eventually came out of the building, was identified as one of the robbers by D.G., and was arrested.

None of the Defendants were licensed to carry a pistol by the Chief of Police of the District of Columbia. The locations at which they carried the pistols, including where they first encountered the victims outside and in the landing where they were holding D.G., were not their homes, place of business, or land or premises possessed and controlled by them. Defendants acted intentionally, voluntarily, and on purpose, not by mistake or accident, and without any legal justification.

## DEFENDANT'S ACKNOWLEDGMENT

I have read and discussed the Government's Proffer of Facts with my attorney. I agree and acknowledge by my signature that this Proffer of Facts is true and correct.

Date: 1-26-23

**Amarion Langston**
Defendant

Date: 1/26/23

**Molly Bunke**
Attorney for Defendant

6